# U.S. BANKRUPTCY COURT
## District of South Carolina

Case Number: **16-06561-jw**
Adversary Proceeding Number: **17-80038-jw**

## Order on Cross Motions for Partial Summary Judgment

The relief set forth on the following pages, for a total of 15 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**11/21/2017**



*signature*

US Bankruptcy Judge
District of South Carolina

Entered: 11/21/2017

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re<br><br>Mary Elaine Barnhardt,<br><br>                                                    Debtor. | C/A No. 16-06561-JW<br><br>Adv. Pro. No. 17-80038-JW<br><br>Chapter 13 |
| Noelle Amy Beckham,<br><br>                                                    Plaintiff,<br><br>v.<br><br>Mary Elaine Barnhardt,<br><br>                                                    Defendant. | |

## ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court on the cross-motions of plaintiff Noelle Amy Beckham ("Plaintiff") and defendant Mary Elaine Barnhardt's ("Defendant") for partial summary judgment on certain legal issues raised by the parties in the pleadings filed in this adversary proceeding. After considering the matters properly before the Court, and pursuant to applicable law, the Court rules as follows:[1]

## **FINDINGS OF FACT**

The following facts are not in dispute:

1.      Plaintiff and Billy Eugene Barnhardt, Jr. ("Husband") married in 1997, separated in 2004, and were divorced by Order of the Richland County Family Court ("Family Court") dated July 22, 2005.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

1

2. Before their 2004 separation, Plaintiff and Husband each owned a "Term to Age 70" life insurance policy on their respective lives, obtained from Northwestern Mutual ("Term Policy").

3. After their separation, but prior to the entry of the final decree of divorce, Plaintiff and Husband, together with their respective legal counsel, engaged the services of a mediator to mediate and resolve issues related to the parties' minor child ("Child") (including custody, visitation, and support), as well as other issues related to the dissolution of the marriage. At the mediation, the parties reached a settlement of the foregoing issues, the terms of which were memorialized in an agreement entered into as of June 30, 2004, entitled "Complete Custody, Support, and Settlement Agreement" (the "Agreement").

4. The Agreement, and its terms, were approved by and merged into the Order of the Family Court entered July 13, 2004 ("Family Court Order").[2]

5. Paragraph 9 of the Approved Agreement provides:

> Life Insurance: Each party has approximately $175,000 in life insurance on his or her respective lives. Each shall maintain that face amount with the other as beneficiary until the term policy expires at age 70. Each party agrees to pay for his or her own policy.

Approved Agreement at 6, ¶ 9.

6. Plaintiff and Husband's divorce became final in mid-2005. Sometime thereafter, Defendant and Husband married.

7. Defendant is not a party to the Approved Agreement, nor does it appear that she was a party to the proceedings pending in the Family Court between Plaintiff and Husband.

8. In November 2015, Husband was terminated by his then employer.

---

[2] The Agreement and Family Court Order will be collectively referred to herein as the "Approved Agreement."

2

9. At some point after entry of the Family Court Order, Husband permitted the Term Policy to lapse.

10. In or around May 2016, Husband became employed by Accelera Solutions Incorporated ("Accelera"). As an incident of his employment with Accelera, Husband became eligible for insurance benefits through Guardian Life Insurance Company of America ("Guardian"), Guardian Life Insurance Group Plan 44002, an ERISA-governed employee benefit plan ("Guardian Policy").

11. On or about June 1, 2016, Husband received basic life insurance coverage in the amount of $50,000. In addition, Husband purchased $175,000 in voluntary term coverage. Husband named Defendant as the sole beneficiary of all benefits under the Guardian Policy.[3]

12. In August 2016, Husband was diagnosed with terminal cancer.

13. In the Fall of 2016, Husband told Plaintiff of his cancer diagnosis, and that he had permitted the Term Policy to lapse. Husband also informed Plaintiff about the Guardian Policy, and that Husband had designated Defendant as the sole beneficiary thereunder.

14. On November 21, 2016, Plaintiff filed a verified petition for contempt with the Family Court wherein she asked the Family Court to hold Husband in contempt for "allowing his life insurance policy to lapse" ("Contempt Motion").[4] In the Contempt Motion, Plaintiff asked the Family Court to order Husband "to produce evidence of or obtain a life insurance policy in the amount of $175,000 with [Plaintiff] listed as the beneficiary." The Contempt Motion does not

---

[3] A copy of the beneficiary designation executed by Husband on June 1, 2016 is attached as Exhibit A to the Declaration of Cassandra Kleppinger, Life Case Manager for Guardian, filed by Plaintiff on October 26, 2017.

[4] The Contempt Motion also alleges that Husband was behind in his monthly child support payments, and also owed Plaintiff approximately $307 for the Child's uncovered medical expenses.

3

mention or reference the Guardian Policy, nor does it assert Plaintiff's belief that she had any rights in the Guardian Policy.

15. On November 29, 2016, the Family Court issued its Order and Rule to Show Cause, scheduling a hearing on the Contempt Motion for January 9, 2017 ("Rule").

16. Husband and Defendant filed a joint petition under Chapter 13 of the Bankruptcy Code on December 30, 2016. As a result of this filing, the hearing on the Rule was stayed.

17. On February 8, 2017, Plaintiff filed a motion for relief from the automatic stay as to Husband ("362 Motion"), wherein she sought relief from the stay to permit her to pursue the Contempt Motion. Husband, through counsel, filed a timely objection to the 362 Motion.

18. On or about March 15, 2017, Husband passed away.

19. Upon Husband's death, Guardian immediately became obligated to make payment pursuant to the Guardian Policy in the amount of $225,000 ("Gross Insurance Proceeds").

20. Before Guardian distributed the Gross Insurance Proceeds, Plaintiff submitted a claim to Guardian asserting an interest in $175,000 of the Gross Insurance Proceeds ("Insurance Proceeds") based on ¶ 9 of the Approved Agreement.[5] There is no evidence or indication in the record that, prior to making her claim after Husband's death, Plaintiff made Guardian aware of the Approved Agreement, or communicated to Guardian her belief that she possessed any interest in the Guardian Policy.

21. Defendant also submitted a claim to Guardian, claiming an interest in the Gross Insurance Proceeds by virtue of her designation as sole beneficiary under the terms of the Guardian Policy.[6]

---

[5] A copy of the claim Plaintiff submitted to Guardian is not part of the record herein.

[6] A copy of the claim Defendant submitted to Guardian is not part of the record herein.

4

22. On April 4, 2017, Plaintiff commenced the above-captioned adversary proceeding against Defendant and Guardian. Although not labeled as a claim for declaratory relief, Plaintiff's first cause of action asks for a declaration from this Court that, "[u]nder South Carolina law, by virtue of the [Approved Agreement, Plaintiff] has a vested right to [the Insurance Proceeds] . . . which right takes priority over the rights of any beneficiary designated in violation of [P]laintiff's rights." *See* Amended Complaint dated April 4, 2017 at ¶ 23.[7] Plaintiff asks for entry of "a judgment . . . declaring that she is the rightful owner of [the Insurance Proceeds] and that [the Insurance Proceeds are] not property of the chapter 13 estate." *Id.*

23. In the second cause of action, again relying on the Approved Agreement, Plaintiff asks the Court to enter judgment against Guardian in the amount of $175,000.

24. On April 12, 2017, Plaintiff withdrew the 362 Motion as moot.

25. On May 8, 2017, Defendant filed an Answer and Counterclaim in the adversary proceeding (collectively "Answer").[8] In the Answer, Defendant disputes Plaintiff's entitlement to the Insurance Proceeds, and asserts her right to the proceeds by virtue of her designation by Husband as the sole beneficiary under the Guardian Policy, and applicable federal law.

26. On May 26, 2017, the Court entered a "Stipulated Consent Order," pursuant to which, in exchange for Plaintiff and Defendant's agreement to dismiss it from the adversary proceeding with prejudice and a general release, Guardian agreed to deliver the undisputed portion of the Gross Insurance Proceeds (approximately $50,000) to Defendant, and to deposit the Insurance Proceeds with the Clerk's Office.

---

[7] Plaintiff filed her original and amended adversary complaint on April 4, 2017. The original and amended complaint will be collectively referred to herein as the "Complaint."

[8] In addition to responding to the allegations set forth in the Complaint, the Answer asserted two (2) counterclaims against Plaintiff for alleged violations of the automatic stay of 11 U.S.C. § 362.

5

27. On June 1, 2017, on motion of the Chapter 13 Trustee, the Court entered an Order Dismissing the Chapter 13 case as to Husband only due to his death.

28. On June 9, 2017, Guardian deposited the Insurance Proceeds with the Clerk of this Court.

29. On June 23, 2017, the Court entered a second Stipulated Consent Order dismissing Guardian from this adversary proceeding with prejudice, generally releasing all Plaintiff and Defendant's claims against Guardian, enjoining any action against Guardian related to the Guardian Policy, and removing Guardian's name from the caption (collectively "Second Stipulated Consent Order").

30. Pursuant to the Second Stipulated Consent Order, Guardian was dismissed from this adversary proceeding with prejudice on June 23, 2017.

## CONCLUSIONS OF LAW

**I.    Jurisdiction**

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). The parties have consented to this Court's entry of final orders and judgments.

**II.    Summary Judgment Standard**

Federal Rule of Civil Procedure 56, made applicable in this adversary proceeding by Bankruptcy Rule 7056, provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the facts and evidence produced by the parties, the Court must draw all reasonable inferences in favor of the nonmoving party, and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper if only one conclusion may reasonably be drawn from the facts presented. *Pulliam Inv. Co., Inc. v. Cameo Properties,* 810 F.2d 1282 (4th Cir. 1987); *Croft v. Bayview Loan Servicing,* LLC, 166 F. Supp. 3d 638 (D.S.C. 2016) (same).

**III.    Analysis**

    **A.  Interplay between ERISA and the Approved Agreement.**

Plaintiff asserts that she is the rightful owner of the Insurance Proceeds by virtue of the Approved Agreement. Plaintiff argues that when Husband entered into the Approved Agreement, he waived his right to designate anyone other than her as the beneficiary of the Guardian Policy, and Husband's attempt to name Defendant as a beneficiary under the Guardian Policy was ineffective. Plaintiff also argues that the Approved Agreement gives her a vested property interest in the Guardian Policy under state law that is superior to Defendant's interests.

Defendant does not dispute that the Approved Agreement required Husband to maintain Plaintiff as the beneficiary of the Term Policy. However, Defendant argues that ERISA preempts Plaintiff's state law-based claims to the Insurance Proceeds, and that Defendant is entitled to the Insurance Proceeds because she is the named beneficiary under the Guardian plan documents.

Congress enacted ERISA in 1974 as a "comprehensive and complex" federal scheme to regulate private pension plans. *Borden, Inc. v. Bakery & Confectionary Union & Indus. Int'l Pension*, 974 F.2d 528, 529 (4th Cir. 1992). Congress intended ERISA to be the "exclusive federal regulation over employee benefit plans," and for the plans to be "subject . . . to only one body of national, uniform law." *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857, 862 (4th Cir. 1998). To ensure the exclusivity of federal regulation and governance, Congress included in ERISA a preemption provision which provides that ERISA "shall supersede any and all State laws insofar

7

as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (West 1985).

ERISA contains one important exception to its state law preemption provisions and the method for a former spouse to obtain an interest in benefits arising under an ERISA plan: a qualified domestic relations order. "A Qualified Domestic Relations Order ('QDRO') is a judgment or order made pursuant to state domestic relations law that establishes the right of an alternate payee to receive benefits payable under an ERISA plan." *Metropolitan Life Ins. Co. v. Leich-Brannan*, 812 F. Supp. 2d 729, 735 (E.D. Va. 2011); *see Unum Life Ins. Co. of Am. v. Brookshire*, Case No. 4:15-cv-01226-RBH-KDW, 2016 U.S. Dist. LEXIS 66607, *11 (D.S.C. April 27, 2016), recommendation and report adopted as modified in 2016 WL 2935892 (D.S.C. May 20, 2016) (With a QDRO, "a plan trustee can directly pay the benefits described in the QDRO to the person in whose favor the QDRO is entered."). Absent a QDRO, the plan trustee is required to adhere to ERISA's "plan documents rule," which requires plan administrators distributing benefits to look and act solely pursuant "to the directives of the plan documents," and nothing else. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009); *Boyd v. Met. Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011) (plan documents control the distribution of plan benefits regardless of the provisions of a divorce decree wherein plan beneficiary had waived his rights to receive any proceeds from deceased's insurance policies); *Leich-Brannan*, 812 F. Supp. 2d at 735 (same); *see also Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (To ensure the ease of distribution of plan benefits, ERISA contains "an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents."); 29 U.S.C. § 1104(a)(1)(D) (employers are to distribute benefits "in accordance with the documents and instruments governing the plan").

Not every domestic relations order qualifies as a QDRO.[9] To qualify, a domestic relations order must "clearly" specify:

1. the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

2. the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

3. the number of payments or period to which such order applies; and

4. each plan to which such order applies.

29 USC § 1056(d)(3)(C).[10] Because it is an exception to ERISA's preemption provisions, "[s]trict compliance with the statutory requirements of 29 U.S.C. § 1056 is required." *Leich-Brannan*, 812 F. Supp. 2d at 736; *accord Wade v. Hampton Roads Shipping Ass'n,* No. 2:07cv347, 2007 WL 3376652, at *4 (E.D. Va. Nov. 7, 2007) ("Courts have strictly applied [the statutory] requirements and have held that a domestic relations order that does not include all of this information cannot be considered a QDRO."); *see also Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d at 863 (with its QDRO provisions, ERISA maintains its own enforcement mechanism for aggrieved former spouses).

---

[9] Indeed, ERISA defines a "domestic relations order" separately from a QDRO:

(i) the term "qualified domestic relations order" means a domestic relations order--

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which--

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B).

[10] The domestic relations order must also comply with the provisions of 29 USC § 1056(d)(3)(D).

9

The Court has reviewed the Approved Agreement, and finds it does not satisfy the statutory requirements set forth in 29 U.S.C. § 1056(d)(3). Although it sets forth the amount of the life insurance to be maintained ($175,000) and arguably the period of time (until the Term Policy expires), the Approved Agreement does not identify Husband's employer or its address, or the specific plan or policy to which the Approved Agreement applies. Nor does the Approved Agreement contain the name and the last known mailing address of the participant, or the name and mailing address of any alternate payee. Because it does not meet the strict statutory requirements of 29 U.S.C. § 1056(d)(3)(C), the Court finds as a matter of law that the Approved Agreement is not a QDRO.[11]

Although the Approved Agreement is not a QDRO, Plaintiff's argument is, in effect, that the Approved Agreement provides her with "an alternate mechanism to obtain plan benefits," separate and apart from Husband's designation of Defendant as the beneficiary in the plan documents, and that the Approved Agreement and South Carolina law should control. *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d at 863; *see Phoenix Mut. Life Ins. Co. v. Adams,* 30 F.3d 554, 560 (4th Cir. 1994) ("the designation of the beneficiary of an ERISA life insurance policy 'relates to' an ERISA plan."). However, Plaintiff's argument ignores the fact that, if allowed to trump the existing beneficiary designation, the Approved Agreement "would directly conflict with ERISA's goal of providing a nationally uniform plan administration and reduce the QDRO provisions to a meaningless footnote in the preemption context." *Pettit*, 164. F.3d at 864. This is exactly the outcome Congress sought to avoid. As explained by the Fourth Circuit:

> If we were to hold that ERISA did not preempt run-of-the-mill domestic relations agreements, . . . then we effectively would read the preemption provision exception, § 1144(b)(7), and the referenced QDRO provision, § 1056(d)(3), out of existence,

---

[11] The Court notes that at no time did Plaintiff advance the argument that the Approved Agreement qualified as a QDRO, or that it complied with the statutory requirements of 29 U.S.C. § 1056(d)(3).

10

> thus violating a fundamental precept of statutory interpretation. . . . We believe Congress made itself clear on this point—unless a domestic relations settlement complies with the QDRO requirements, ERISA preempts its enforcement through a state law mechanism . . . .

*Pettit*, 164 F.3d at 865.

Because Plaintiff is not in possession of a QDRO, ERISA demands that disposition of the Insurance Proceeds be made pursuant to the provisions of Husband's beneficiary designation. The Court finds that the Approved Agreement is preempted by ERISA as a matter of law. The Court further finds that, pursuant to Husband's designation of Defendant as beneficiary under the Guardian plan documents, Defendant is the proper beneficiary of the Insurance Proceeds and is entitled to their distribution.

**B.    Plaintiff's Other Arguments**

To the extent that Plaintiff does not specifically contend that the Approved Agreement is a QDRO, or dispute that the plan documents rule applies, she argues that because Guardian has paid the Insurance Proceeds into the Court, "ERISA no longer speaks to property rights in those benefits, and state law is free to operate." Plaintiff also argues that, having consented to Guardian's deposit of the Insurance Proceeds with the Court, Defendant waived application of ERISA to this case, as well as her interest in and rights to the Insurance Proceeds. The Court disagrees.

Plaintiff is correct that "ERISA does not preempt post-distribution suits against ERISA beneficiaries." *Andochick v. Byrd*, 709 F.3d 296, 301 (4th Cir.) *cert. denied,* ––– U.S. –––, 134 S. Ct. 235 (2013). However, the Court notes that this action was initiated by Plaintiff as a lawsuit against Defendant and Guardian, before Guardian had the opportunity to either distribute the Insurance Proceeds or bring an interpleader action against Plaintiff and Defendant pursuant to 28 U.S.C. § 1335. Furthermore, the Insurance Proceeds have yet to be distributed, as Guardian's delivery of the Insurance Proceeds to the Clerk was not the equivalent of a distribution to or for

the benefit of Defendant.[12] Instead, the Clerk is merely serving as the temporary holder of the funds for purposes of this adversary proceeding. Actual distribution of the Insurance Proceeds can only occur after order of this Court.

Even assuming, for the sake of argument, that a deposit of the Insurance Proceeds with the Clerk qualified as a distribution of the proceeds, Plaintiff's Complaint does not allege that Defendant is liable to Plaintiff, nor does the Complaint assert a post-distribution claim against Defendant. Instead, the Complaint merely seeks a declaration that Plaintiff is the "rightful owner" of the Insurance Proceeds by virtue of the Approved Agreement, a declaration that the Insurance Proceeds are not property of the estate, and a request for a monetary judgment against Guardian. The Complaint does not state a claim against Defendant individually, does not contain a prayer for alternate relief in the event Plaintiff's first cause of action fails, and states no other ground or sufficient facts for relief.[13] Inasmuch as this Order fully disposes of Plaintiff's first cause of action, at this point in time, there is nothing remaining for the Court to decide.[14]

With respect to the impact of the Stipulated Consent Order on the parties' rights and claims: it has the same practical and legal effect as if this action had been commenced by Guardian as an interpleader suit:[15] Plaintiff and Defendant agreed to permit Guardian to deposit the Insurance

---

[12] As recognized recently by the South Carolina District Court, "Interpleader actions such as this one filed by ERISA plan stakeholders are quite common . . . [i]ndeed, it has been held that failure to interplead can constitute breach of ERISA's fiduciary duty of prudent plan administration." *Unum Life Ins. Co. of Am. v. Brookshire*, Case No. 4:15-cv-01226-RBH-KDW, 2016 U.S. Dist. LEXIS 66607, *8 (D.S.C. April 27, 2016) (internal citation and quotation marks omitted), recommendation and report adopted as modified in 2016 WL 2935892 (D.S.C. May 20, 2016).

[13] In her second cause of action, Plaintiff requested judgment against Guardian in the amount of $175,000. Plaintiff's second cause of action is mooted by the Stipulated Consent Order, pursuant to which Plaintiff waived all claims against Guardian.

[14] Inasmuch as Defendant was not a party to the Approved Agreement, the Approved Agreement does not appear to form a basis for a claim against Defendant.

[15] "The goal of an interpleader action is to '[a]bsolve the stakeholder from the threat of multiple liability by determining which of the claimants is entitled to the stake.'" *State Farm Life Insurance Company v. Murphy*, Case

Proceeds with the Clerk, waived all further claims against Guardian, allowed Guardian to be dismissed from this action with prejudice, and agreed to proceed with their individual claims against the Insurance Proceeds. Neither Stipulated Consent Order effects a "distribution" of the Insurance Proceeds, and they do not, and were not intended to, eliminate or adversely affect either Plaintiff or Defendant's claim to the Insurance Proceeds, nor does it create rights for either party to the funds in question.

## CONCLUSION

The Approved Agreement is not a QDRO and is preempted by ERISA. Defendant was designated by Husband as the beneficiary of the Insurance Proceeds pursuant to the plan documents, which control the disposition of the Insurance Proceeds. Defendant is the beneficiary of the Insurance Proceeds pursuant to ERISA, the Insurance Proceeds are property of the bankruptcy estate, and Defendant is entitled to judgment as a matter of law on the first cause of action, rendering moot Defendant's equitable claims. Accordingly, the Insurance Proceeds, with any accrued interest, shall be disbursed to Defendant. To this end, within seven (7) days after entry of this Order, Defendant shall provide the Clerk of Court with a completed AO Form 213.[16] The Clerk of Court shall complete the local disbursement requirements within seven business days from receipt of the completed AO 213.

Finally, it appears that as a result of this ruling, the only matter remaining before the Court is the adjudication of Defendant's legal claims against Plaintiff for alleged violations of the automatic stay. Within ten (10) days, counsel for the parties are directed to consult and to advise

---

No. 2:15–cv–04793–DCN, 2017 WL 2216296, *3 (D.S.C. May 19, 2017) (citing *Equitable Life Assurance Soc'y v. Jones*, 679 F.2d 356, 358, n.2 (4th Cir. 1982)).

[16] Defendant may obtain a copy of this form either by contacting the Clerk's office, or downloading a .pdf fillable form from www.rid.uscourts.gov/menu/generalinformation/forms/vendor/ao_213.pdf.

the Court in writing whether or not those issues are ready for trial, or if additional discovery or a status conference is needed.

**AND IT IS SO ORDERED.**